FILED

10/23/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 22, 2024

## STATE OF TENNESSEE v. THOMAS DEQUAN SOLOMON

**Appeal from the Criminal Court for Knox County**
**No 108635    G. Scott Green, Judge**

———————————————

### No. E2024-00457-CCA-R3-CD

———————————————

The Defendant, Thomas Dequan Solomon, appeals from the judgment of the trial court revoking his probation and ordering him to serve the balance of his sentence in confinement. Specifically, the Defendant contends that the trial court erred by basing its decision merely on proof of alleged criminal conduct prior to the filing of formal charges and without considering his history of supervision while on probation. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Susan E. Shipley, Knoxville, Tennessee, for the appellant, Thomas Dequan Solomon.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Jordan Murray and Carolina Hughes, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On August 24, 2017, the Defendant pleaded guilty to attempted second degree murder and aggravated assault. *See* Tenn. Code Ann. §§ 39-12-101; -13-102, -210. In exchange for his guilty pleas, the Defendant received an effective sentence of ten years to be served in split confinement, with the balance of the sentence on supervised probation.

On October 13, 2023, a violation of probation warrant was filed alleging that the Defendant had violated the terms and conditions of his probation by possessing firearm ammunition, failing to communicate with his probation officer, and failing to report for a scheduled risk assessment. The violation warrant was amended on November 29, 2023, to add an additional allegation that the Defendant had committed a new criminal homicide offense.

A revocation hearing was conducted on February 29, 2024, during which the State introduced proof and both parties argued regarding the then-uncharged homicide allegation. Tony Pennington testified that on the morning of October 9, 2023, he was walking along Martin Luther King, Jr. Avenue in Knoxville, Tennessee, between 10:40 and 10:45 a.m. While walking, he saw a Black man, who had dreadlocks and was dressed in a brown jacket and blue jeans, approach a female pedestrian on the opposite side of the street from Mr. Pennington. According to Mr. Pennington, the Black male then shot the woman and got into a white car that drove away from the scene. Mr. Pennington indicated that he observed the shooting from approximately twenty feet away and that he reported it to an officer who was parked nearby, at which time he was able to point out the car as it was driving away. Because the car had tinted windows, Mr. Pennington was unable to see inside it, but he identified the Defendant in the courtroom as the man he saw approach and shoot the victim before entering the car. On cross-examination, Mr. Pennington stated that he believed another person was driving the vehicle because he saw the Defendant get into the passenger's side before it drove away.

Detective Jonathan Harris with the Knoxville Police Department testified that he investigated the shooting and reviewed video surveillance footage of the victim walking along Martin Luther King, Jr. Avenue on the morning of October 9, 2023. Additional footage depicted a white car entering and leaving the area of the shooting between 10:42 and 10:45 a.m. From this footage, he obtained a license plate number that identified the vehicle in question as belonging to the Defendant's mother. Det. Harris also obtained footage from a Ring doorbell camera at the Defendant's home showing the Defendant entering the car and driving away from the residence at 10:32 a.m., then returning and exiting the car at 10:55 a.m. In this footage, the Defendant was wearing jeans and a greenish-brown jacket with a fur-rimmed hood. Det. Harris further testified that the approximate drive time between the Defendant's home and the scene of the shooting was between nine and eleven minutes. He acknowledged on cross-examination that he did not have any clear video footage of the Defendant stopping or exiting the car at or in close proximity to the scene of the homicide.

At the conclusion of the hearing, the trial court stated, "I don't think there's any question in this court's mind that [the Defendant] is in material violation of the terms and

conditions of his probation." The trial court next invited argument from the parties as to the consequence to impose, stating, "Now the question becomes what do I do[?] What does the [c]ourt do as far as a sanction[?]" Defense counsel stated that the Defendant's "caseworkers who provide him services" were present in the courtroom. According to defense counsel, the caseworkers were willing to continue working with the Defendant if they were allowed to do so. The Defendant made additional argument about the sufficiency of the State's proof but ultimately asked the trial court to allow the Defendant to continue in his treatment program and "[k]eep him on a short leash." The State urged the trial court to consider the underlying offenses of the Defendant's probationary sentence and ongoing concerns about safety to the community. The trial court noted on the record that the Defendant was on probation for attempted second degree murder and aggravated assault.

After considering the parties' arguments, the trial court remarked that there was "an eyewitness who has identified [the Defendant] as the shooter and then just almost incontrovertible proof, direct and circumstantial proof, that [the Defendant was] in close proximity in [his] mother's vehicle to where this homicide took place at the time it took place." Following this, the trial court observed that it would "be very shocked" if the State did not seek formal charges against the Defendant given the abundant proof. The trial court then revoked the Defendant's probation and ordered him to serve the balance of the sentence in the Tennessee Department of Correction.

The Defendant filed a timely notice of appeal.

## II.    ANALYSIS

The Defendant argues on appeal that the trial court erred by revoking his probation based upon limited proof that the Defendant committed the offense of criminal homicide prior to the filing of formal charges and because the trial court did not consider his supervisory history while on probation. The State responds that the trial court properly revoked the Defendant's probation based upon its finding by a preponderance of the evidence that the Defendant had materially violated the terms of his probation by committing the offense of criminal homicide. We agree with the State.

Appellate courts review a trial court's revocation of probation decision for an abuse of discretion with a presumption of reasonableness "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies

- 3 -

reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). If a trial court fails to state its findings and reasoning for the revocation on the record, appellate courts may conduct a de novo review if the record is sufficiently developed, or the appellate court may remand the case for the trial court to make such findings. *Dagnan*, 641 S.W.3d at 759 (citing *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)).

Probation revocation is a two-step consideration requiring trial courts to make two distinct determinations as to (1) whether to revoke probation and (2) what consequences will apply upon revocation. *Dagnan*, 641 S.W.3d at 757. No additional hearing is required for trial courts to determine the proper consequences for a revocation. *Id.* The trial court's findings do not need to be "particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Id.* at 759 (citing *State v. Bise*, 380 S.W.3d 682, 705-06 (Tenn. 2012)).

"The trial judge may enter judgment upon the question of the charges as the trial judge may deem right and proper under the evidence adduced before the trial judge." Tenn. Code Ann. § 40-35-311(d)(1). "If the trial judge finds by a preponderance of the evidence that the defendant has violated the conditions of probation and suspension of sentence, then the court may revoke the defendant's probation and suspension of sentence, in full or in part, pursuant to § 40-35-310." *Id.* Notwithstanding subdivision (d)(1), the probation statute provides for two categories of probation violations, technical and non-technical, with differing penalties for both. *State v. Walden*, No. M2022-00255-CCA-R3-CD, 2022 WL 17730431, at *3 (Tenn. Crim. App. Dec. 16, 2022), *no perm. app. filed*.

The following are classified as non-technical violations: a defendant's commission of a new felony or a new Class A misdemeanor, a zero tolerance violation as defined by the department of correction community supervision matrix, absconding, or contacting the defendant's victim in violation of a condition of probation. Tenn. Code Ann. § 40-35-311(e)(2). Once a trial court determines that a defendant has committed a non-technical violation of probation, the trial court may: (1) order confinement for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period not exceeding one year; (4) return the defendant to probation on appropriate modified conditions; or (5) resentence the defendant for the remainder of the unexpired term to a sentence of probation. *See id.* §§ -308(c), -310, -311(e)(2).

We reject the Defendant's claim that the proof did not "reliably" establish that the Defendant violated the laws of Tennessee based upon questions left unresolved regarding

- 4 -

the homicide and the testimony of the witnesses. Here, the trial court found that the Defendant was in material violation of his probation for committing a new offense, explaining that there was an eyewitness who identified the Defendant and proof of his proximity to the homicide. The trial court's findings, although relatively brief, were sufficient to communicate its reasoning as to the revocation decision. The trial court credited witness testimony and video footage as establishing by a preponderance of the evidence that the Defendant, while on probation, violated the terms of his probation by committing a homicide, a non-technical violation. *See* Tenn. Code Ann. § 40-35-311(d)(1), (e)(2).

The Defendant also complains that the prosecution did not present testimony from his probation officers at the revocation hearing. There is no requirement, however, for the State to do so. If the Defendant wished to elicit favorable proof from his probation officer, or any other witness, he could have done so by calling such witnesses himself at the revocation hearing. Defense counsel noted that caseworkers were present to testify, but they were not called. As set forth above, the proof in the record is sufficient to show that the State met its burden in this proceeding, and the trial court did not abuse its discretion by revoking the Defendant's probation based on the proof introduced.

Turning to the second step of *Dagnan*, the Defendant asserts that the trial court did not consider any alternatives to incarceration as a consequence for the revocation finding. Alternatively, the Defendant argues that, if the revocation is upheld, this court should remand the case back to the trial court for "further inquiry into the second step of a revocation hearing procedure."

Here, after determining that revocation was appropriate, the trial court invited argument from the parties as to the consequence to impose. Both the trial court's invitation to the Defendant to make a request as to the sanction and the Defendant's subsequent request for continued treatment and supervision indicate that the trial court did in fact consider alternatives to incarceration. The trial court also heard argument from the State urging it to consider the underlying offenses of the Defendant's probationary sentence and ongoing concerns about safety to the community. The trial court noted on the record that the Defendant was on probation for aggravated assault and attempted second degree murder, a consideration that is only appropriate in the second step of a *Dagnan* analysis. *See Dagnan*, 641 S.W.3d at 759 n.5.

Ultimately, the trial court ordered the remainder of the Defendant's sentence to be served in incarceration but only after allowing both parties to be heard on the consequence it should impose. Thus, we conclude that the trial court did not fail to conduct a proper

inquiry into the second step of the revocation hearing before imposing judgment, nor that the trial court abused its discretion by ordering the Defendant to serve the balance of his sentence in incarceration.

### III. CONCLUSION

In consideration of the foregoing, we affirm the judgment of the trial court.

_____

KYLE A. HIXSON, JUDGE